UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

PHH MORTGAGE CORPORATION,

    Appellant,

  v.

JAN M. SENSENICH, Chapter 13 Trustee,
ALLEN BEAULIEU AND LAURIE
BEAULIEU, NICHOLAS GRAVEL AND
AMANDA GRAVEL, and MATTHEW
KNISLEY AND EMILIE KNISLEY,

    Appellees.

Case Nos.  5:16-cv-00256-gwc
                  5:16-cv-00257-gwc
                  5:16-cv-00258-gwc

### DECISION ON APPEAL

In these bankruptcy appeals, Appellant PHH Mortgage Corporation ("PHH") challenges the imposition of $375,000 in sanctions against it in three Chapter 13 cases pending in the U.S. Bankruptcy Court for the District of Vermont. PHH was the mortgage servicer in each case. All three cases concerned debtors who remained in their homes after filing their bankruptcy petitions. All three made "conduit mortgage payments" through the office of the U.S. Trustee.[1] All three were ultimately successful in making payments under their Chapter 13 plans and preserving their homes.

The basis for the sanctions was the admitted violation of Bankruptcy Rule 3002.1, which limits the time in which a mortgage creditor is permitted to bill for post-petition charges. With respect to Appellees Nicholas Gravel and Amanda Gravel ("the Gravels"), the charges were

---

[1] A conduit mortgage payment is a payment made by the trustee on behalf of the debtor. The debtor makes payment to the trustee, who passes along the monthly payment ordered in the Chapter 13 plan. *See generally Making Post-Petition Mortgage Payments Inside Chapter 13 Plans: Facts, Law, Policy*, American Bankrupcy Law Journal, Spring 2006. The mortgage conduit process is intended to reduce uncertainty and disputes over the accounting of post-petition mortgage payments by debtors. In Vermont, this process is governed by Vt. LBR 3015-2(j).

1

property inspection fees totaling $258.75. With respect to Appellees Allen Beaulieu and Laurie Beaulieu ("the Beaulieus"), the charges were property inspection fees totaling $56.25 and insufficient funds fees totaling $30. With respect to Appellees Matthew Knisley and Emilie Knisley ("the Knisleys"), the charges were property inspection fees totaling $246.50 and late charges totaling $124.50.

In order to describe the factual and legal issues presented in this appeal, the court will first consider the facts of each of the three bankruptcy cases at issue and the sanctions orders issued in each. Then, the court will consider the nature of these sanctions in light of constitutional requirements of due process. Finally, the court will consider the statutory and inherent authority of the Bankruptcy Court to impose the type of sanctions at issue in this case. Before reaching these issues, however, the district court considers the basis and scope of its jurisdiction over appeals from the Bankruptcy Court.

## SCOPE OF REVIEW

This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1). Federal Rule of Bankruptcy Procedure 8013 establishes the standard governing a district court's review of a bankruptcy court's order and states that a district court functions as an appellate court and may affirm, modify, reverse, or remand an order with instructions for further proceedings.

"Generally in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo." *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 482–83 (2d Cir. 2012) (citing Fed. R. Bankr. P. 8013). The facts giving rise to these appeals were not in dispute before the Bankruptcy Court and are not challenged on appeal. This court's review of the legal issues is de novo. With this scope of review in mind, the court turns to the facts of each of the three cases.

# FACTS

The facts of each case are drawn from the appendices provided by the parties. These include detailed documentation of each dispute.

A. <u>The Gravels</u>

The Gravels filed their Chapter 13 bankruptcy petition in February 2011. The plan provided for a total of 60 monthly mortgage payments. They began to make payments in March 2011. These payments comprised an $847.33 mortgage payment, a $201.36 payment towards pre-petition arrears, and a $28.25 payment of administrative arrears.[2]

Pursuant to Standing Order 10-02, the Trustee accounted for the payments in March and April 2011 as paid towards the administrative arrearage. These payments were sent to PHH. Commencing in May 2011, the monthly payments were forwarded to the PHH as conduit mortgage payments. Because PHH did not receive monthly conduit mortgage payments for the first two months covered by the Chapter 13 plan, it termed the loan delinquent and began to accrue penalties for late payment. In 2013, it threatened foreclosure. (A-41.) The trustee responded with a series of letters explaining that PHH had failed to credit the administrative arrearage payments to the total post-petition payments. (A-42.)

This dispute over the monthly payments came to a head in February 2014, when the trustee sought an order to compel PHH to comply with the conduit payment and to apply mortgage payments as provided by the terms of the confirmed Chapter 13 plan. The trustee also

---

[2] In 2010, the Vermont Bankruptcy Court adopted a procedure which governs the commencement of post-petition payments. In addition to making monthly payments through the conduit payment process, the debtor is responsible for paying an "administrative arrearage claim." This claim is mandatory. The payments go to the mortgage creditor "during the term of the Chapter 13 Plan and [are] intended to address the fact that payments of the regular monthly (conduit) mortgage payment by the trustee will not typically commence until approximately 30 to 60 days from the date the petition is filed. The purpose of including an Administrative Arrearage Claim in a Plan is to allow conduit mortgage payments to start later than the first mortgage payment due date after the filing of the petition and for those payments to be caught up in the following months of the Plan." Standing Order 10-02. The court notes that Standing Order 10-02 was superseded by Standing Order 11-04, and that Standing Order 11-04 was itself subsequently superseded by Standing Order 16-08, which governs the current conduit mortgage payment system.

requested an award of sanctions to the debtors. (A-26.) In response, PHH fell on its sword: "[PHH] acknowledges that there have been errors in processing and applying Debtors' post-petition payments. By way of explanation, and not excuse, [PHH] notes that this Court's Conduit Mortgage Program is unique to our state and represents a miniscule fraction of the overall number of loans serviced by [PHH]." (A-94.) The parties stipulated to a payment of $9,000 to the debtors in settlement of this dispute. The Bankruptcy Court entered an order to that effect on March 21, 2014.

Two years later, in April 2016, the Gravels reached the end of their five-year Chapter 13 plan. They completed 60 payments through the Conduit Mortgage Program plus two more payments accounted for as "administrative arrearage." They also satisfied the pre-petition arrearage of $12,178.24. (A-101–02.) PHH's attorneys indicated their agreement, A-107–108, and the Bankruptcy Court issued an order on May 20, 2016, confirming that the debtors had cured any mortgage arrearage or default existing on the date the bankruptcy case was filed.

On May 25, 2016, PHH sent what it called "the monthly Bankruptcy statement" to the debtors. It had been sending such statements every month during the pendency of the case. Every statement shows a charge for "property inspection fees," with the amount gradually increasing. The statement dated March 2, 2011, shows an amount due for property inspection of $86.75. (A-45.) By August 2, 2011, this amount had increased to $98. (A-51.) By May 25, 2016, it had grown to $258.75.

The trustee struck back. Without prior discussion, the trustee filed a motion for contempt and sanctions on June 13, 2016. In that motion, the trustee took issue with the May 25, 2016 statement for two reasons. First, the charges were more than 180 days old; an earlier statement from PHH sent to the debtors in May 2014 showed the same amount due of $258.75. Second, the

4

request for payment violated the Bankruptcy Court's order dated May 20, 2016, entered with the agreement of the parties, stating that all pre- and post-petition payments had been made through April 1, 2016, "including all monthly payments and any other charges or amounts due under their mortgage with PHH Mortgage Corporation." (A-109.)

On June 14, 2016, PHH removed the property inspection fees from the Gravels' account. (A-134.)

### B. The Beaulieus

The relevant facts concerning the Beaulieus are similar, except that there had been no dispute over crediting them with the "administrative arrearage" payments. The Beaulieus filed for Chapter 13 protection in March 2011. A monthly statement from PHH in September 2012 showed an insufficient funds fee of $30. In March 2013, PHH added a property inspection fee of $45. The property inspection increased in April 2013 to $56.25. On May 5, 2016, the court issued an order stating that the Beaulieus had completed all payments due through May 1, 2016. On May 25, 2016, PHH sent the Beaulieus a monthly statement showing the property inspection and insufficient funds fees. (A-195.) At this time, both charges had been pending for more than 180 days. (A-192.) On June 14, 2016, the trustee filed a motion for contempt and sanctions. On the same day, PHH removed the charges from the Beaulieus' account. (A-208.)

### C. The Knisleys

The relevant facts regarding the Knisleys are similar, except that the Knisleys have not reached the end of their Chapter 13 plan. The claim arising out of the Knisleys' bankruptcy thus concerns only the 180-day limitation on post-petition charges. The Knisleys filed for Chapter 13 protection in June 2012. A statement dated May 25, 2016, showed a late charge balance of $124.50 and property inspection fees of $246.50. (A-236.) Previous statements show that a

substantial portion of the fees on the May 25, 2016 statement were incurred more than 180 days prior to the statement. (A-270–300.) Following filing of the motion for contempt and sanctions on June 14, 2016, PHH removed the fees before any payment by the debtors.

### D.  Action by the Bankruptcy Court

On September 12, 2016, the Bankruptcy Court issued a written Memorandum of Decision in which it found that PHH had violated Rule 3002.1(c) in each of the three underlying cases. It imposed sanctions pursuant to Rule 3002.1(i) in the amount of $25,000 for each case, totaling $75,000. The Bankruptcy Court also found that PHH had violated Debtors Current Orders regarding the Gravels and the Beaulieus by sending statements representing that post-petition fees were due, and imposed sanctions pursuant to its inherent powers and its authority under 11 U.S.C. § 105 in the amounts of $100,000 with respect to the Beaulieus and $200,000 with respect to the Gravels. The Bankruptcy Court ordered that all of these sanctions, totaling $375,000, be paid to Legal Services Law Line of Vermont.

This timely appeal followed. On appeal, PHH challenges the sanctions, arguing that the Bankruptcy Court was not authorized to impose them either under Rule 3002.1(i), its inherent authority, or 11 U.S.C. § 105, and that even if it was, the amount of the sanctions imposed was so excessive as to constitute an abuse of discretion.

## ANALYSIS

The Bankruptcy Court articulated three bases for its authority to impose the challenged sanctions: Rule 3002.1(i), its inherent authority, and 11 U.S.C. § 105. This court examines in turn the validity of each of these proposed sources of authority.

I. Rule 3002.1(i)

Rule 3002.1(i) provides, in relevant part, that if a mortgage creditor fails to disclose a fee or charge in a Rule 3002.1(c) notice, the Bankruptcy Court:

> may, after notice and hearing, take either or both of the following actions:
>
> (1) preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or is harmless; or
>
> (2) award other appropriate relief, including reasonable expenses and attorney's fees caused by the failure.

In imposing $75,000 of the challenged sanctions, the Bankruptcy Court relied on the provision of Rule 3002.1(i)(2) authorizing it to "award other appropriate relief" caused by PHH's failure to disclose the underlying fees. PHH argues that the history of Rule 3002.1 demonstrates that the Advisory Committee on Bankruptcy Rules intended the scope of this "other appropriate relief" to be tightly circumscribed, and that sanctions such as those at issue here fall outside that scope.

Principally, PHH points to the minutes of the June 1–2, 2009 meeting of the Committee on Rules of Practice and Procedure[3] ("June 2009 Minutes") at 12–13 and the minutes of the April 29–30, 2010 meeting of the Advisory Committee on Bankruptcy Rules[4] ("April 2010 Minutes") at 6–8, wherein those committees discussed at length whether the proposed rule that would eventually become Rule 3002.1(i) went too far by amounting in practice to disallowance of a claim. PHH also points to the May 27, 2010 Report of the Advisory Committee on Bankruptcy Rules[5] ("2010 Report"). The 2010 Report documents that committee's consideration of the proposed rule, and its subsequent vote to recommend the enacted version of the rule rather than a previous version that made preclusion of the undisclosed information mandatory and that

---

[3] *Available at* http://www.uscourts.gov/sites/default/files/fr_import/ST06-2009-min.pdf (last accessed Dec. 5, 2017).
[4] *Available at* http://www.uscourts.gov/sites/default/files/fr_import/BK04-2010-min.pdf (last accessed Dec. 5, 2017).
[5] *Available at* http://www.uscourts.gov/sites/default/files/fr_import/BK05-2010.pdf (last accessed Dec. 5, 2017).

did not include the language in the Committee Note specifying that "inadequate documentation of a proof of claim, by itself, is not a basis for disallowance" and that "the court retains discretion to allow an amendment to a proof of claim under appropriate circumstances and to impose a sanction different from or in addition to the preclusion of the introduction of evidence." 2010 Report at 9–11.

PHH argues that these historical documents demonstrate the Committees' intent that the sanctions imposable under Rule 3002.1(i) be no more severe than disallowance of the claim. It contends that the "other appropriate relief" language, read in light of the legislative history, was intended to give bankruptcy courts the authority to impose sanctions less drastic than the mandatory exclusion of undisclosed information when a lesser sanction is appropriate. The use of this language as a basis for imposing a punitive sanction in an amount far greater than the value of the undisclosed claim is, PHH submits, a misapplication of the law.

The Trustee argues that the plain language of the rule embodies a grant of broad authority to craft appropriate remedies, and that the sanctions imposed by the Bankruptcy Court fell within the scope of that authority. The Trustee also argues that power to impose monetary sanctions is necessary to deter mortgage creditors from attempting to collect unauthorized fees and charges, and that the rule should be read in a way that grants the Bankruptcy Court this power in order to avoid what it characterizes as the "absurd" result of mortgage creditors facing no negative consequences from seeking to collect undisclosed charges.

The question of whether Rule 3002.1(i) authorizes the imposition of punitive sanctions appears to be a question of first impression, not just in the Second Circuit, but across the nation. The parties have not cited and the court has not found any case from any American jurisdiction

in which a bankruptcy court has imposed sanctions on this basis and in this manner. The Bankruptcy Court acknowledged that it acted without precedent. Memorandum of Decision at 7.

The analysis turns on the certain and straightforward principle that, however broadly the language of Rule 3002.1(i) sweeps, the powers it bestows cannot be without limit. At the absolute minimum, these powers cannot extend beyond the outer bounds of the authority of the Bankruptcy Court, as delineated by statute and precedent. Any other conclusion would require reading Rule 3002.1(i) to abrogate the substantive law limiting the Bankruptcy Court's authority to impose punishments and to expand the Bankruptcy Court's substantive powers. A procedural rule can effect no such expansion. *See generally* Bankruptcy Rule 9020, Notes of Advisory Committee on 2001 Amendments ("Issues relating to the contempt power of bankruptcy judges are substantive and are left to statutory and judicial development, rather than procedural rules."); *but see In re Rainbow Magazine, Inc.,* 77 F.3d 278, 284–85 (9th Cir. 1996) (determining that Congress's adoption of a modified Bankruptcy Rule 9020 functioned to expand the substantive contempt authority of the Bankruptcy Court). The authority conferred by Rule 3002.1(i) cannot exceed the scope of the substantive powers of the Bankruptcy Court.

For the reasons set forth in the following section, the court concludes that the Bankruptcy Court's order imposing sanctions pursuant to Rule 3002.1(i) exceeded the scope of the Bankruptcy Court's powers as delineated by statute and precedent and therefore exceeded the scope of Rule 3002.1(i).

II. Statutory and Inherent Authority

The remaining $300,000 of sanctions were imposed pursuant to 11 U.S.C. § 105 and the Bankruptcy Court's inherent authority. Section 105 gives the Bankruptcy Court broad authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of" the Bankruptcy Code. The inherent authority of the bankruptcy courts to craft orders necessary to their mission has long been recognized. *See In re Kalikow*, 602 F.3d 82, 96 (2d Cir. 2010) ("The statutory contempt powers given to a bankruptcy court under § 105(a) complement the inherent powers of a federal court to enforce its own orders."). In this respect, the bankruptcy courts stand in the same position as other federal courts which may exercise inherent authority to respond to violations of their orders. "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Anderson v. Dunn*, 19 U.S. 204, 227 (1821)), though "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44.

There is broad consensus among the circuit courts that Section 105 imbues the Bankruptcy Court with the power to adjudicate civil contempt and impose compensatory sanctions in a wide variety of factual and procedural contexts. The courts have also been careful to note that criminal contempt, which is characterized by the imposition of punitive sanctions, is of a distinct character and requires special consideration. *See, e.g.*, *In re Power Recovery Sys., Inc.,* 950 F.2d 798, 802 (1st Cir. 1991) (proclaiming that "[i]t is well-settled law that bankruptcy courts are vested with contempt power" in a civil contempt case involving only compensatory and coercive sanctions); *In re Walters*, 868 F.2d 665, 669 (4th Cir. 1989) (upholding a bankruptcy court's contempt finding and order directing a debtor's attorney to return excess fees not previously authorized by the court based on Section 105); *In re Terrebonne Fuel and Lube, Inc.*, 108 F.3d 609 (5th Cir. 1997) ("a bankruptcy court's power to conduct civil contempt proceedings and issue orders in accordance with the outcome of those proceedings lies in 11 U.S.C. § 105"); *In re Rainbow Magazine, Inc.,* 77 F.3d at 284 (holding that Section 105 imbues

bankruptcy courts with the same inherent authority as Article III courts to impose sanctions for bad faith conduct in litigation); *Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1557–58 (11th Cir. 1996) ("Sanctions are coercive if they serve the complainant rather than vindicate some public interest. Sanctions are also coercive if the contemnor has the ability to control the extent of the sanction.") (internal citations omitted); *In re Hardy*, 97 F.3d 1384, 1390 (11th Cir. 1996) (holding that Section 105 authorizes bankruptcy courts to impose punitive sanctions as a general matter, but only coercive sanctions could be imposed against the IRS because the federal government had waived its sovereign immunity only with respect to coercive sanctions and remained immune to punitive sanctions).

The United States Courts of Appeals have been deeply divided for many years on the question of whether bankruptcy courts have the power to punish criminal contempts or impose punitive sanctions. *See generally In re Dyer*, 322 F.3d 1178, 1193 n.15 (9th Cir. 2003) (collecting cases from both sides of the circuit split). Neither the Bankruptcy Court nor the parties cite any Second Circuit case directly addressing the question, and this court's research has revealed none.

Placing the issue in proper context requires a review of the evolution of the Bankruptcy Court's contempt authority over time, which has been, in brief, as follows. The Bankruptcy Act of 1898 severely restricted the ability of a referee in bankruptcy to address contempts; section 41 of the 1898 Act required the certification of contemptuous conduct to a district judge. The landscape changed in 1973 with the promulgation of Bankruptcy Rule 920, which recognized the authority of bankruptcy judges to impose sanctions for civil contempt up to $250. In 1978, Congress enacted 28 U.S.C. § 1481 (since repealed), which provided in part: "A bankruptcy

court…may not…punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment."

Bankruptcy Rule 9020, effective in 1983, continued this evolutionary process. As originally drafted, the rule authorized the bankruptcy judge to punish criminal contempt—whether committed in the presence of the court or not—and required certification to the district court of cases involving conduct warranting imprisonment or a fine in excess of $250. *See* Bankruptcy Rule 920(a)(4) (1983).

In 1984, in response to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984. These amendments repealed many prior provisions, including 28 U.S.C. § 1481, which had provided contempt authority. In 1987, amendments to Rule 9020 introduced a new procedure under which objections to a contempt order were subject to a 10-day appeal period. The Advisory Committee note expresses uncertainty as to the statutory authority of bankruptcy judges to conduct contempt proceedings at all:

> There are no decisions by the courts of appeals concerning the authority of bankruptcy judges to punish for either civil or criminal contempt under the 1984 amendments. This rule, as amended, recognizes that bankruptcy judges may not have the power to punish for contempt.

Bankruptcy Rule 9020, Notes of Advisory Committee on 1987 Amendments. The current version of Rule 9020 came into effect in 2001. The Advisory Committee notes remained agnostic regarding the authority of the bankruptcy court to punish for contempt:

> [T]hese amendments are not intended to extend, limit, or otherwise affect either the contempt power of a bankruptcy judge or the role of the district judge regarding contempt orders. Issues relating to the contempt power of bankruptcy judges are substantive and are left to statutory and judicial development, rather than procedural rules.

*Id.*, Notes of Advisory Committee on 2001 Amendments. As amended, Rule 9020 provides that contempt proceedings are governed by Bankruptcy Rule 9014, which provides a procedure for

the resolution of contested matters by motion when they are not otherwise governed by other provisions. These two rules impose procedural protections such as notice and an opportunity to be heard, but as procedural rules, they provide no source of substantive authority.

It thus appears to the court that the prevailing trend in the development of bankruptcy law over recent years has been to place ever-tightening limits upon bankruptcy courts' contempt authority. It also appears that, even at the apex of their power in the 1983, bankruptcy courts did not have the express statutory or rule-based authority to impose punitive sanctions in excess of $250.

Circuit court decisions applying these principles have reached a variety of results. This court is most persuaded by the reasoning of decisions which restrict the authority of the bankruptcy courts to impose punitive sanctions.

The court finds highly persuasive the reasoning set forth in *Dyer*, 322 F.3d at 1193, where the Ninth Circuit held that neither Section 105 nor the Bankruptcy Court's inherent authority were proper sources of authority for the imposition of a serious punitive sanction. The *Dyer* court's analysis of Section 105 offers a convincing explanation for why that statute cannot justify serious punitive sanctions:

> Section 105(a) contains no explicit grant of authority to award punitive damages. Rather, the language of § 105(a) authorizes only those remedies "necessary" to enforce the bankruptcy code. The sanctions associated with civil contempt—that is, compensatory damages, attorney fees, and the offending creditor's compliance—adequately meet that goal, rendering serious punitive sanctions unnecessary.

322 F.3d at 1178. The *Dyer* court also noted that bankruptcy courts are ill-equipped to provide the procedural protections that due process of law requires before the imposition of punishment, and that the administration of punishment by an Article I body raised constitutional concerns. *See id.* at 1194. The *Dyer* court acknowledged the ambiguity in the term "serious," but was

satisfied that the $50,000 award at issue in that case was sufficiently "serious" to fall outside the authority conferred by Section 105. *See id.* at 1193. The amount at issue in the present case is much greater.

The court also finds persuasive the reasoning set forth by the Fifth Circuit in *In re Hipp, Inc.*, 895 F.2d 1503 (5th Cir. 1990). In *Hipp*, the Fifth Circuit noted that, even after the Bankruptcy Amendments and Federal Judgeship Act of 1984, United States Bankruptcy Judges still lack the tenure and compensation protections constitutionally afforded to Article III judges to ensure judicial independence. *Id.* at 1510. The *Hipp* court concluded that, in the absence of such protections, it was constitutionally impermissible for bankruptcy courts to exercise criminal contempt powers.

In an unpublished opinion, the Sixth Circuit also determined that the constitutional concerns articulated in *Dyer* and *Hipp* precluded a finding of either statutory or inherent authority for punitive sanctions. *See In re John Richards Homes Bldg. Co.*, 552 F. App'x 401, 415–16 (6th Cir. 2013). The Sixth Circuit followed the Ninth Circuit in ruling that bankruptcy courts lack both statutory and inherent authority to impose serious punitive sanctions, while leaving the precise bounds of "seriousness" undefined. *See id.*

In the present cases, the Bankruptcy Court cited the First Circuit case of *In re Charbono*, 790 F.3d 80, 85 (1st Cir. 2015), in support of its determination that its inherent authority gave it the power to impose punitive sanctions. *See* Memorandum of Decision at 12, n.8. The First Circuit did indeed hold that bankruptcy courts have inherent authority to impose punitive sanctions for violation of an order, even after the sanctioned party had already purged its noncompliance. *See id.* The Supreme Court cases cited in support of the holding of *Charbono* do not actually provide any direct support for the court's ruling; they consider in dicta the possible

14

reach of the Bankruptcy Court's authority in settings not before the court. *See Law v. Siegel*, 134 S. Ct. 1188, 1198 (2014) ("The court *may* also possess further sanctioning authority under either § 105(a) or its inherent powers.") (emphasis added); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375–76 (2007) ("[E]ven if § 105(a) had not been enacted, the inherent power of every federal court to sanction abusive litigation practices *might well* provide an adequate justification for a prompt, rather than a delayed, ruling on an unmeritorious attempt to qualify as a debtor under Chapter 13.") (emphasis added; internal citation omitted). Speculative discussion of this nature does not provide authoritative support for the significant extension of authority proposed by the *Charbono* decision. These authorities alone cannot hold the weight of the extension of the Bankruptcy Court's authority embodied by *Charbono* decision and the cases like it from other circuits. The First Circuit also gave little weight to the crucial institutional differences between Article III courts and the Bankruptcy Court, which, in this court's view, are important to the resolution of this question.

For the same reasons, this court is skeptical of the holding of *Isaacson v. Manty*, 721 F.3d 533, 538–39 (8th Cir. 2013), where the Eighth Circuit held that a punitive sanction for contumacious conduct by a corporate officer of a debtor corporation, payable to the court, was essentially criminal in nature, and was nevertheless within the scope of the Bankruptcy Court's inherent authority. *Isaacson* represents an expansion of *In re Ragar*, 3 F.3d 1174, 1177 (8th Cir. 1993), where the Eighth Circuit held that Section 105 provided authority for the Bankruptcy Court to enter a preliminary finding of criminal contempt, essentially making proposed findings of fact and conclusions of law, while giving the putative contemnor an opportunity to make a record of objections and leaving the adjudication of those objections and the entry of final judgment of contempt to the district court. Such a procedure is certainly well within the bounds

15

of the Bankruptcy Court's authority; it does not follow that the Bankruptcy Court has the authority to impose punishment directly. The *Isaacson* court provided little explanation for its conclusion that the Bankruptcy Court's inherent authority included the power to impose punitive sanctions, did not wrestle with the constitutional concerns raised in *Dyer* and *Hipp*, did not acknowledge *Ragar*, and did not acknowledge the circuit split on the question.

It appears to the court that, on balance, the better-reasoned authorities favor the narrower construction of the Bankruptcy Court's statutory and inherent punitive sanctions power. This narrower construction is also consistent with the direction of Second Circuit precedent addressing the scope of the Bankruptcy Court's contempt authority in other contexts. For instance, in *In re Kalikow*, the Second Circuit stated that Section 105 "does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.'" 602 F.3d at 96 (quoting *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003)). In *Kalikow*, the Second Circuit rejected the proposition that Section 105 could serve as an independent basis for an award of sanctions absent a violation of some other provision of the Bankruptcy Code. *Kalikow* is not directly controlling, but it suggests that a more limited view of the scope of the Bankruptcy Court's power to impose punitive sanctions would prevail in the Second Circuit.

Having considered the process of the evolution of the law, having scrutinized precedential authorities from other circuits on both sides of the circuit split, and having taken some guidance from relevant case law from the Second Circuit, this court concludes that the statutory and inherent powers of the Bankruptcy Court are not sufficient to support the Bankruptcy Court's imposition upon PHH of $300,000 in punitive sanctions.

The court notes that this conclusion does not leave bankruptcy litigants free to engage in contemptuous conduct with impunity. By the nature of the Bankruptcy Court as "a unit of the district court," 28 U.S.C. § 151, the district court retains the authority to impose punitive sanctions for criminal contempt before the Bankruptcy Court. *United States v. Guariglia*, 962 F.2d 160, 163 (2d Cir. 1992). Should the Bankruptcy Court determine that the exercise of that authority would be appropriate, it may refer the matter to the district court. Alternatively, it may take steps to enforce its orders short of punitive sanctions of the scope and type imposed in these cases.

## CONCLUSION

For the reasons set forth above, the court concludes that the Bankruptcy Court did not have the authority to impose the challenged sanctions in these cases on appeal. The Bankruptcy Court's orders in each case are accordingly **VACATED** and the matters are **REMANDED** to the Bankruptcy Court for further proceedings not inconsistent with this decision.

Dated at Rutland, in the District of Vermont, this 18th day of December, 2017.

      __/s/ Geoffrey W. Crawford__
      Geoffrey W. Crawford, Judge
      United States District Court